DUFRESNE, Judge.
This appeal involves two consolidated suits. The first was filed by Boes Iron Works, Inc. against Elmwood Savings and Loan association (now in receivership with the Resolution Trust Corporation) seeking damages and alleging that Elmwood failed to procure fire insurance, after representing that it would do so, on a building owned by Boes which burned. The second was a suit by Elmwood against Roger T. Boes (owner of Boes Iron Works) for payment of a promissory note. A jury awarded Boes Iron Works $60,000 on the insurance related claim, and awarded Elmwood $25,859.74 in principal and interest, and $6,464.93 in attorney fees, in the suit on the note. All parties have appealed.
For the following reasons, we vacate the award of $60,000 to Boes Iron Works and grant judgment in favor of Elmwood in the insurance related claim. We also increase the award in favor of Elmwood in the suit on the note to $34,945.72. In all other respects, the judgment is affirmed.
The pertinent dealings between the parties as to the insurance matter began in early 1984, when Boes borrowed $169,000, from Elmwood. This loan was secured by a mortgage on property described as lots 3, 10, 11, 12, 13, 14 and 15, square 457, in the first district of New Orleans. The act of mortgage included a standard hazard insurance clause whereby the borrower was required to maintain fire insurance on all improvements, and provided that if this were not done, the lender was authorized to purchase such coverage and charge the costs to the borrower. The incontrovertible intent of this clause was to protect the lender’s security interest, rather than that of the borrower.
*1191 At the loan closing in February, 1984, Boes presented two fire policy binders. The first, for about $45,000, covered four houses on lots 12, 13, 14 and 15. It was not shown whether this binder ever matured into a final policy, but in any case Boes testified that these houses were torn down with Elmwood’s approval shortly after the loan was made. The second binder was for $75,000, and covered an old church, the building at issue here, which occupied lots 10 and 11. A final policy did issue on this building, as per the binder, by American Guarantee and Liability Insurance Company, effective February 15, 1984, through February 15, 1987.
It was further shown that Boes operated his iron fabrication business from several modern metal buildings on lots adjoining the mortgaged properties, and that he used the church building for storage. These other buildings were insured by Liberty Mutual Insurance Company. In early 1986, Boes attempted to place coverage for the church building with Liberty Mutual as well, but was informed by John Schindler, this insurer’s representative, that his company would not undertake that risk because of the building’s age of about 60 years. Schindler testified that he was familiar with the church because he had visited Boes’ shop “many, many times”, and had looked over the structure.
It is not clear whether the American Guarantee policy was still in effect at this time, but nonetheless, in March, 1986, Boes contacted Robert Rodrigue, an independent agent, in regard to insuring the church. Rodrigue came to the site to discuss the matter, and Boes made an application wherein he requested $45,000 hazard coverage for the building and $20,000 for the contents. Rodrigue was able to get a binder from Lloyds of London for these amounts, but this underwriter demanded that a number of improvements be made on the structure before it would issue a final policy. Boes duly received this list of requirements, which included repairs on crumbling masonry on the front of the building, installation of fire extinguishers, repair of window panes (all of which had been broken by vandals), re-connection of the burglar-alarm system, and general clean-up and maintenance. He testified that he made all of these repairs and improvements, and so notified Rodrigue.
Rodrigue testified that he did not recall whether or not he received this information, but in either case it did not reach the underwriters timely, and they therefore canceled the binder as of June 8, 1986. Notice of cancellation was sent by ordinary mail to the address of the church, rather than to Boes’ office next door. Although the letter was never returned to the sender, Boes testified that he never received it. Assuming this to be true, the only expectation Boes could thus have had at that time was that the building was insured for $45,-000 through March of 1987.
In early May of 1987, Ms. Becnel, a loan service employee of Elmwood, noted that Boes’ loan file did not show current insurance on the church. Whether Elmwood’s records showed an expiration date of February 15, 1987, as per the old American Guarantee policy, or March 18, 1987, as per the canceled Lloyd’s binder, is not shown in the record. In any case, on May 12, 1987, Ms. Becnel sent Boes a letter informing him of the lack of evidence of fire insurance, and stated as follows:
If I do not receive a policy within two weeks, I will assume you are not presently covered. Therefore, I will obtain insurance for you and charge the premiums to your escrow account.
Boes did not respond to this letter in any way, and stated that he never received either a policy or a bill for the premiums from Elmwood between receipt of the letter and the fire at the church on October 2, 1987. Neither did he recall ever attempting to contact Schindler or Rodrigue about this situation.
Ms. Becnel testified that when she received no response to her letter, she contacted another insurance agent about coverage, and several days later this agent told her that he was unable to place the policy. At that point, she turned the matter over to her supervisor, Pamela Lemley. Ms. Lemley stated that she could not recall *1192 whether any further efforts were made to procure the coverage, or whether she ever contacted Boes again about the problem.
After the church burned, it became clear that it was not in fact insured. Boes sued Elmwood alleging that he had relied on the May 12, 1987 letter and assumed that the building would be insured, and that the bank’s failure to place the policy renders it liable to him for the loss. The bank’s position is, first, that the letter did not absolve Boes of his legal obligation under the loan agreement to maintain hazard insurance, or obligate the bank to do so. Second, it urges that by his own admissions Boes knew that the building was uninsured when it burned, and therefore could not have been relying on the letter as grounds to believe otherwise. Finally, it proposes that if it is liable, its liability cannot exceed $45,000, the amount of coverage for which Boes had applied in regard to the Lloyds policy of March, 1986.
Our review of the record convinces us that Boes knew at the time of the fire that the building had not been insured by Elmwood, and that the jury’s apparent finding to the contrary was manifestly erroneous. We therefore find merit in Elm-wood’s second argument, and on the facts of record reverse the finding of liability against it.
The applicable standard of review is set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989) as follows:
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings: for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination, (at 844-845)
The evidence presented by Elmwood to controvert Boes’ assertions that he relied on the May 12 letter, and therefore assumed that the building was insured, consisted of several alleged admissions by him to the contrary on the day of the fire.
Two firemen who were on the scene testified. Both produced their incident reports which contained notations that the building was uninsured, and both stated that this information was given to them by Boes at the scene. Both also noted in their reports that Boes stated that the building was going to be demolished. One of the firemen admitted that he could not actually remember the conversation with Boes, but rather was relying on his report for its substance. The other, Chief Earl Gorron-donna, whose job at the time was to investigate for possible arson, stated that he specifically remembered Boes telling him that the building was uninsured, but could not repeat the conversation verbatim. He also stated that the portion of his report form regarding the uninsured status of property was filled out at the scene, and that information simply recopied later onto a clean report form at the office. He noted that insurance coverage is a key factor in arson investigations, and that had there been any question as to the existence of insurance he would have so noted, and then followed up with further inquiries, neither of which was done in this case. He finally testified that he had a clear recollection of this fire because after speaking with Boes, he was injured for the first time in his life at a fire scene, when his leg went through a piece of flooring.
Immediately after the firemen’s testimony, Boes testified as follows:
Q. Do you remember what you told [the fireman] about the insurance?
A. Not exactly, other than, you know, basically what’s on the report.
Q. Did you tell him you had no insurance?
A. From what I recall, I really don’t recall.
*1193 Q. Did you at the time the building burned down, think that the building was insured?
A. I sure did.
Q. Why would then you have told somebody from the fire prevention bureau there was no insurance?
A. He might have asked me specific insurance companies, whatever. I really don’t recall and I would have to tell him I don’t know.
Earlier in the trial, before the firemen appeared, this colloquy took place on cross-examination of Boes:
Q. And you spoke to the fire people at the scene of the fire?
A. Yes, sir.
Q. Did you tell one of the fire people at the scene was — first, it was your intention to demolish the building?
A. Might have been in general conversation, yes, sir.
Q. You saw the fire reports in this case, didn’t you? You have seen the fire report in this case?
A. Yes.
Q. You read them?
A. Yes, sir.
Q. You talked about them? You said that the information in them was correct?
A. That’s right.
Yet another document introduced by Elmwood was an October 2, 1987, hand written file memorandum made and initialed by Ms. Lemley concerning a phone call received from Boes on that date which reads:
Mr. Boes telephoned me this date to notify us that a vacant church that occupied his property at above address had burned down Thursday night. The property was not insured. Don’t know what his intentions are regarding this loan.
Ms. Lemley testified that she did not specifically remember the conversation, but that the only way she could have learned that the property was uninsured during the course of the call was if Boes had so stated to her.
Boes contended at trial that Ms. Lem-ley’s memo was mistaken, and that he had actually called to find out the name of the insurance company with which Elmwood had placed the coverage.
In this court’s opinion, the above evidence is such that a reasonable fact finder could simply not have credited Boes’ testimony that he believed the building to have been insured at the time of the fire. Three contemporaneous documents made within hours of the event by three different people, all show that Boes stated that the church was not insured. While two of these, standing alone, might be open to speculative doubt, the third is based on uncontroverted first-hand recollection; and when all three are taken together, it is unreasonable to have rejected their substance. Specifically, the Lemley memorandum might reasonably have been found suspect by the jury because produced by a party who at the time may have been concerned about her possible failure to follow up on the placement of insurance. The first fireman’s report might similarly be questionable on the grounds that he may have either made a mistake in preparing it or in initially collecting information from Boes. The testimony of Chief Gorrondon-na is subject to none of these speculations. He testified that he specifically recalled Boes telling him that the building was uninsured, and stated that as an arson investigator he would certainly have followed up his investigation had there been any question as to insurance. Additionally, he was a disinterested witness. Further, Boes did not refute either fireman’s report or recollection, but rather stated that he did not recall what he had told them. Considering this evidence, we can only conclude that any finding by the jury that Boes did not know at the time of the fire that the building was uninsured is manifestly erroneous.
But were the above evidence not sufficient to render Boes’ story inconsistent or implausible on its face, there is other evidence to so indicate. During cross-examination about his understanding of his insurance on the church when he received the May 12, letter from Elmwood, he gave ambiguous answers. He indicated that he *1194 thought Liberty Mutual had that coverage, or perhaps Rodrigue. Yet he made no effort that he could recall to verify either. While coverage through Rodrigue’s efforts may have been a plausible explanation through March of 1987, Boes must certainly have known whether he had paid premiums on that policy for the March 1987, to March 1988, period. As to Liberty Mutual, Schindler’s testimony that his company would not insure the building and that he had been to Boes’ shop on numerous occasions, belies any assertion on Boes’ part that on May 12, 1987, he had some reasonable belief that he might have been insured by that company, and was therefore surprised by Elmwood’s letter. While these issues are not dispositive of the ultimate question of whether Boes relied on the May 12, letter, they nonetheless shed substantial light on the credibility of his overall testimony. And when placed in the context of the three reports made on the day of the fire, the entire body of evidence shows that he must then have known that there was no insurance on the building, and therefore that he had not relied on Elmwood’s conditional letter as a firm commitment to procure such insurance.
Having determined that the jury fell into manifest error in apparently finding that Boes relied on the May 12, letter, we further conclude from the evidence of record that he knew at the time of the fire that Elmwood had not placed this insurance. In this circumstance, Elmwood cannot be liable to him for failing to perform an act which he knew it had not performed, and one which he was obligated to perform under the mortgage agreement for the benefit of the lender, rather than himself. The essential factors which must be established when a party urges equitable estoppel are 1) a representation by conduct or work; 2) a justifiable reliance thereon; and 3) a change of position to one’s detriment because of the reliance, John Bailey Contractor, Inc. v. State Through D.O.T.D., 439 So.2d 1055 (La.1983). In the present matter, it is manifest that Boes knew the building to be uninsured, and therefore he has failed to show that he had any reliance on the letter which led him to change his position to his own detriment. He thus cannot prevail against the Bank.
The second suit was brought by Elmwood against Roger Boes for payment of a note unrelated to the transaction involving the church building. Elmwood presented the original note, admitted as valid by Boes, in the amount of $23,750.00. Ms. Mike Gannon, a representative of the RTC, testified that the bank’s records showed that no payments had been made on that note, and that at the time of trial unpaid interest amounted to $11,195.72, making a total owing as of that date of $34,945.72.
In rebuttal, Boes testified that he had made one payment on this note in the amount of $3,000 to $5,000. Presumably on the basis of this indefinite and otherwise unsubstantiated testimony, the jury awarded Elmwood $25,859.74, in principal and interest. This was an obvious error on the part of the jury. In a suit on a note, which is admitted to be valid, the only issue is the amount owing, less the amount paid.
Here, the bank put on a prima facie case that the amount owing on the note as of trial was some $35,000. The defendant did not contest either the principal or interest, but simply testified that he had made one payment of between $3,000 and $5,000. He produced no check or receipt for this payment, nor did he give even an approximate date when this payment might have been made.
In Fontenot v. LaFleur, 281 So.2d 868 (La.App. 3rd Cir.1973) the court ruled that once a creditor has shown that a specific debt is due, the debtor must specially plead and prove full or partial payment.
Here, the testimony of Boes is so devoid of any indicia of reliability as to render it meaningless. We must therefore conclude that he has failed to establish by competent and specific testimony, or other evidence, that any payments were made on the note. And because he has not even suggested that the calculation of interest by the bank was erroneous, we can only assume that the amount testified to by Gannon is correct.
*1195 We therefore must increase the jury award on the note to $34,945.72, an amount conclusively shown to be owing.
The final issue here is the award of $6,464.93 in attorney fees, for collection of the note, which Boes contends are excessive. It appears that the jury awarded this amount as per its judgment on the note, which provided 25% for such fees. Subsequent to trial, Boes raised this same issue in the trial court via a motion for a new trial, and in denying this motion it is apparent that the trial judge found this amount reasonable. We see no abuse of discretion by either the jury or the trial judge in finding this fee reasonable on the facts of the case.
For the foregoing reasons, we set aside the judgment of $60,000 in favor of Boes Iron Works, Inc., and render judgment in favor of Elmwood Savings and Loan Association, in the insurance related case. We further increase the award to Elmwood for principal and interest in the suit on the note to $34,945.72. In all other respects, the judgment is affirmed.
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED IN PART.